DA 12-0219

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 167

IN THE MATTER OF:

A.D.B.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DN-09-74
Honorable Karen S. Townsend, Presiding Judge

COUNSEL OF RECORD:

    For Appellant Mother:

        Wade Zolynski, Chief Appellate Defender, Koan Mercer, Assistant
Appellate Defender, Helena, Montana

    For Appellant Father:

        Jeanne M. Walker, Hagen & Walker, PLLC, Billings, Montana

    For Appellant A.D.B.:

        Lisa Kauffman, Attorney at Law, Missoula, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

        Fred Van Valkenburg, Missoula County Attorney, Matthew Lowy, Deputy
Missoula County Attorney, Missoula, Montana

Submitted on Briefs:  March 27, 2013

Decided:  June 20, 2013

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    The District Court for the Fourth Judicial District, Missoula County, terminated the parental rights of A.D.B.'s Mother and Father. Mother, Father and A.D.B. now appeal that decision.

¶2    Mother raised two issues on appeal which we have restated as follows:

¶3    1.  Did the Montana Department of Public Health and Human Services (DPHHS) make reasonable efforts to reunite Mother with A.D.B.?

¶4    2.  Did the District Court err in concluding that Mother's drug addiction rendered her unfit to parent A.D.B. and that her condition was unlikely to change within a reasonable time?

¶5    Father raised three issues on appeal which we have restated as follows:

¶6    3.  Did the District Court have jurisdiction to terminate Father's parental rights?

¶7    4.  Did Father's attorney render ineffective assistance of counsel?

¶8    5.  Did the District Court err in terminating Father's parental rights based upon his incarceration for mitigated deliberate homicide?

¶9    A.D.B. raises one additional issue which we have restated as follows:

¶10   6. Did the District Court correctly conclude that termination of Mother's and Father's parental rights was in A.D.B.'s best interest?

**Factual and Procedural Background**

¶11   A.D.B. was born in April 2009. Mother, who was 19 years old at the time of A.D.B.'s birth, has struggled with chemical dependency since she was 13 years old. On December 10, 2009, Mother was arrested for Driving Under the Influence while A.D.B.

2

was in the vehicle with her. The next day, Father was arrested and charged with deliberate homicide. A.D.B. was removed from her parents' custody and placed with her maternal uncle.

¶12 On December 18, 2009, DPHHS filed a petition for temporary legal custody of A.D.B. The District Court appointed counsel for both parents and for A.D.B., and also appointed a guardian ad litem for A.D.B. At an adjudicatory hearing held on January 19, 2010, Mother did not contest that, based upon Mother's conduct, A.D.B. was a youth in need of care. Mother stipulated to the court granting DPHHS temporary legal custody of A.D.B. for six months. The court granted Father's request to continue the hearing as it related to him for an additional two weeks. At a subsequent hearing, Father also stipulated that A.D.B. was a youth in need of care as a consequence of Father's conduct. DPHHS established treatment plans for both Mother and Father, and the District Court determined that both treatment plans were reasonable and appropriate.

¶13 On June 21, 2010, DPHHS moved the District Court to extend temporary legal custody of A.D.B. for an additional six months. Although Mother objected to a six-month extension, she informed the court that she would not object to a three-month extension. Father asked for a postponement of the hearing until after his criminal trial.

¶14 Father was convicted of mitigated deliberate homicide on July 16, 2010. He was sentenced to 40 years in the Montana State Prison with no possibility of parole. On July 20, 2010, Father appeared at a hearing in this case and informed the court that he did not object to the extension of A.D.B.'s temporary legal custody with DPHHS for an additional six months.

3

¶15 Thereafter, Mother successfully completed her treatment plan. Thus, on November 8, 2010, the District Court dismissed her as a party to the proceedings. That same day, DPHHS filed a petition to terminate Father's parental rights to A.D.B. based upon Father's long-term incarceration for his conviction of mitigated deliberate homicide.

¶16 On December 7, 2010, Father filed a motion to dismiss DPHHS's petition to terminate his parental rights arguing that since A.D.B. had been successfully reunited with her Mother, A.D.B. was no longer a youth in need of care, and DPHHS had no authority to petition the court to terminate Father's parental rights. However, not long after Mother was dismissed from the youth-in-need-of-care proceedings, DPHHS received a referral that Mother had relapsed and was once again using drugs. On December 8, 2010, she tested positive for Methadone. Consequently, on December 21, 2010, DPHHS filed its "Renewed Petition for Immediate Protective Services, Adjudication as a Youth in Need of Care, and Temporary Legal Custody as a Consequence of the Mother's Conduct." Hence, the District Court awarded DPHHS emergency protective services over A.D.B. until the show cause hearing or further order of the court. In addition, because of the ongoing proceedings, DPHHS filed a notice of withdrawal of its petition to terminate Father's parental rights stating that ruling on the termination petition was unnecessary at this time. A.D.B. was placed with her maternal grandparents.

¶17 On January 6, 2011, DPHHS filed a petition to extend temporary legal custody of A.D.B. for six months. And, on January 26, 2011, DPHHS filed a motion with the court

4

to approve a second treatment plan for Mother. At the May 4, 2011 dispositional hearing, both Mother and Father stipulated that temporary legal custody of A.D.B. should be transferred to DPHHS for six months. Hence, the District Court continued A.D.B.'s temporary custody with DPPHS until November 4, 2011, or further order of the court. The court also approved the second treatment plan for Mother.

¶18 On June 14, 2011, Mother tested positive for Opiates, Benzodiazepine, Methadone and Oxycodone. DPHHS moved to amend Mother's treatment plan to include attendance at an inpatient drug treatment program. DPHHS wanted Mother in an inpatient program because Mother had completed outpatient drug treatment twice and relapsed both times.

¶19 At a November 1, 2011 status hearing, the parties informed the court that they were still trying to get Mother placed in an inpatient treatment facility. However, on November 3, 2011, Mother overdosed on illegal drugs. She was found unconscious on the floor at her grandmother's home. Mother was transported to the hospital where she was stabilized and later released. As a result of this incident, Mother was charged with Criminal Possession of Dangerous Drugs, a felony, and Criminal Possession of Drug Paraphernalia, a misdemeanor. The following day, November 4, 2011, DPHHS filed a petition to extend its temporary legal custody of A.D.B. for an additional six months.

¶20 On December 6, 2011, the parties again appeared in the District Court. DPHHS advised the court of Mother's recent drug overdose and that Mother had been charged with felony possession of dangerous drugs from that incident. DPHHS petitioned for Termination of both Mother's and Father's parental rights on December 20, 2011.

¶21 Mother filed a motion to amend her treatment plan on December 27, 2011. She proposed in her motion that she apply for admission to Elkhorn Treatment Center in Boulder, Montana, and upon admission, she would attend and engage in chemical dependency treatment and successfully complete that treatment program. Elkhorn is a nine-month-long inpatient treatment program typically reserved for Department of Corrections' commitments. Mother would not be allowed to have A.D.B. with her while at Elkhorn. DPHHS did not object to Mother's motion, and the District Court issued an order to so amend the treatment plan.

¶22 On January 5, 2012, Mother appeared for an arraignment on the drug charges from November 2011. She was released on her own recognizance on the condition that she not use any drugs not prescribed by a physician. However, just two days later, law enforcement officers stopped a vehicle in which Mother was a passenger. After a consent search of the vehicle, officers found syringes and a spoon containing residue that tested positive for Morphine. A used syringe and cotton were also found in Mother's purse. Mother admitted to acquiring Dilaudid and shooting it up earlier that day.

¶23 Mother was transported to the Missoula County Detention Center. During a videotaped interview at the detention center, when officers left the interview room, Mother removed a pill bottle from one of her bags and placed it in the left side of her bra. She also placed a call on her cell phone and asked the individual on the other end of the line to save her $30 worth of black-tar heroin. She promised to meet up with this individual in 30 minutes. Needless to say, Mother was not released from custody. That same day, Mother's mother complained to law enforcement officers that Mother had

6

stolen $2,100 in jewelry from her home. Based on these incidents, Mother was charged on January 23, 2012, with Criminal Possession of Dangerous Drugs, a felony, Criminal Possession of Drug Paraphernalia, a misdemeanor, Theft, a felony, and Solicitation of Criminal Distribution of Dangerous Drugs—Narcotic or Opiate, a felony. On February 7, 2012, Mother entered pleas of guilty to all six of the criminal charges pending in the District Court.

¶24 The District Court held a hearing on the petition to terminate Mother's and Father's parental rights on February 15-17, 2012. After receiving testimony from various counselors and social workers who had worked with Mother over the past two years, along with testimony as to Father's long-term imprisonment, the District Court terminated both Mother's and Father's parental rights to A.D.B. The District Court entered detailed findings of fact and conclusions of law on March 1, 2012, wherein the court stated that "Mother has not complied with any of the tasks of her most recent treatment plan" and that although she could not comply with the task requiring inpatient treatment at Elkhorn, "she was able to comply with all of the other tasks, and complied with none of them." The court further stated that Mother "could have complied with other recommended inpatient drug treatment and chose not to do so."

¶25 Thus, the District Court determined that pursuant to § 41-3-609(1)(f), MCA, the court was permitted to terminate the parent-child relationship between A.D.B. and her Mother "for the Mother's failure to successfully complete her Court-ordered treatment plan and for the reason that her conduct or condition that renders her unfit . . . (her serious drug addiction and her unwillingness to engage in necessary treatment)" is

7

unlikely to change within a reasonable time. In addition, the court determined that § 41-3-609(1)(f), MCA, permitted the court to terminate the parent-child relationship between A.D.B. and her Father "because the conduct or condition of the Father rendering him unfit (incarceration) is unlikely to change within a reasonable time."

¶26 Mother, Father, and A.D.B. all appeal the District Court's termination order.

**Standard of Review**

¶27 We review a district court's decision to terminate parental rights for an abuse of discretion. *In re E.Z.C.*, 2013 MT 123, ¶ 19, 370 Mont. 116, ___ P.3d ___ (citing *In re T.W.F.*, 2009 MT 207, ¶ 17, 351 Mont. 233, 210 P.3d 174). A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice. *E.Z.C.*, ¶ 19 (citing *In re A.J.W.*, 2010 MT 42, ¶ 12, 355 Mont. 264, 227 P.3d 1012). In addition, we review a district court's findings of fact to determine whether they are clearly erroneous, and its conclusions of law to determine whether they are correct. *E.Z.C.*, ¶ 19 (citing *T.W.F.*, ¶ 17). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court is left with a definite and firm conviction that the district court made a mistake. *E.Z.C.*, ¶ 19 (citing *T.W.F.*, ¶ 17).

**Issue 1.**

¶28 *Did DPHHS make reasonable efforts to reunite Mother with A.D.B.?*

¶29 Mother contends that termination of the parent-child relationship just two months after Mother's treatment plan was amended to include a nine-month, inpatient treatment

program violated good faith reunification efforts. Likewise, A.D.B.'s counsel argues that deeming a plan unsuccessful because of deficits known when the plan was developed and ordered violates the good faith requirement.

¶30 The State argues that DPHHS made every possible effort to reunite Mother with her daughter over the previous three years, but Mother persistently refused to participate in the level of treatment she needed and continued to engage in drug-addictive behavior. The State points out that it was Mother who moved to amend the treatment plan, not DPHHS, and Mother only did so *after* DPHHS filed its petition to terminate her parental rights. DPHHS did not object to Mother's motion to amend the treatment plan because Mother's DPHHS caseworker recognized that Mother was in desperate need of inpatient treatment as soon as possible. In fact, after Mother filed her motion to amend the treatment plan, Mother was arrested for more drug-related felony offenses to which she pled guilty. The State also points out that neither Mother nor counsel for A.D.B. argued that Mother's treatment plans were not reasonable and appropriate.

¶31 A parent's right to the care and custody of a child is a fundamental liberty interest which must be protected by fundamentally fair proceedings. *E.Z.C.*, ¶ 21 (citing *A.J.W.*, ¶ 15). Nevertheless, a court may terminate the parent-child legal relationship upon clear and convincing evidence that the parent has subjected the child to aggravated circumstances, "including but not limited to abandonment, torture, chronic abuse, or sexual abuse or chronic, severe neglect of a child." *E.Z.C.*, ¶ 21 (citing §§ 41-3-609(1)(d) and -423(2)(a), MCA).

> Clear and convincing evidence is "[s]imply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be established by a preponderance of the evidence or by a clear preponderance of the proof. This requirement does not call for unanswerable or conclusive evidence. The quantity of proof, to be clear and convincing, is somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt."

*E.Z.C.*, ¶ 22 (quoting *A.J.W.*, ¶ 5); *see also In the Matter of E.K.*, 2001 MT 279, ¶ 32, 307 Mont. 328, 37 P.3d 690. "The paramount concern is the health and safety of the child, and the district court must give 'primary consideration to the physical, mental and emotional conditions and needs of the child.' " *E.Z.C.*, ¶ 22 (quoting *A.J.W.*, ¶ 15; § 41-3-609(3), MCA).

¶32    Nevertheless, citing *In re D.B.*, 2007 MT 246, ¶ 33, 339 Mont. 240, 168 P.3d 691 [hereinafter *D.B. I*], and § 41-3-423(1), MCA (requiring "reasonable efforts . . . to reunify families"), Mother points out in her brief on appeal that the State "has a duty to act in good faith in developing and executing a treatment plan to preserve the parent-child relationship and the family unit . . . and [the State's] duty to act in good faith does not end once the court has approved a treatment plan." Mother maintains that DPHHS did not act in good faith in this case when it followed through with terminating her parental rights only two months after her treatment plan was amended.

¶33    Mother and counsel for A.D.B. ignore all of DPHHS's efforts over the years to reunite Mother and A.D.B. including compliance coaching, parenting classes, home visits, individual counseling and mentoring, subsidized childcare, and outpatient chemical dependency treatment. Moreover, even if we were to conclude that DPHHS did not act

10

in good faith in following through with terminating Mother's parental rights before she had a chance to enter the Elkhorn treatment program, the fact remains that Mother did not successfully complete the remaining tasks of her treatment plan despite DPHHS and the court giving her many opportunities to do so.

¶34 The District Court determined in its March 1, 2012 Findings of Fact, Conclusions of Law, and Order that Mother failed in all of the following aspects of her treatment plan: Mother did not seek out an individual counselor after learning that her preferred choice of counselor was no longer accepting new patients; Mother did not engage in intensive outpatient treatment as previously ordered by the court; Mother did not participate in the Suboxone maintenance program through Turning Point; Mother tested positive for drugs 12 times in the period from June 14, 2011, to January 7, 2012; and Mother missed 28 drug tests during that same time period.

¶35 The District Court stated that "Mother's continued drug use demonstrates that she is more concerned with getting her next fix than in what is best for her daughter. Thus, she presents a significant risk to her daughter rendering her unfit, unable or unwilling to provide adequate parental care . . . ." The court also determined that although Mother had not had the opportunity to attempt the Elkhorn treatment program, she previously had several opportunities to actively pursue inpatient treatment, but did not follow through.

¶36 Furthermore, at the time the treatment plan was amended to include inpatient treatment for Mother at Elkhorn, neither DPHHS nor the court knew that Mother would so blatantly reoffend just a few days later. Mother's treatment plan was amended to include treatment at Elkhorn on December 29, 2011. Mother was arrested for additional

11

drug offenses—including her attempt to score black-tar heroin while waiting in the interview room at the Missoula County Detention Center—on January 7, 2012, just one week later.

¶37 Accordingly, we hold that DPHHS did make reasonable efforts to reunite Mother with A.D.B.

**Issue 2.**

¶38 *Did the District Court err in concluding that Mother's drug addiction rendered her unfit to parent A.D.B. and that her condition was unlikely to change within a reasonable time?*

¶39 Mother contends that the District Court erred in granting DPHHS's petition to terminate her parental rights because DPHHS failed to prove by clear and convincing evidence that Mother's chemical dependency was unlikely to change within a reasonable time through the court-ordered inpatient treatment program at Elkhorn. Similarly, A.D.B.'s counsel argued in A.D.B.'s brief on appeal that the District Court erred in finding that Mother's history of relapsing into drug addiction rendered her unable to change within a reasonable period of time.

¶40 The State argues that based upon Mother's long history of abusing drugs and her resistance to inpatient treatment, it is highly unlikely that her drug-addictive behavior will change within a reasonable time. The State points out that Mother had three years to become sober, but instead, she continued to use drugs and failed to successfully complete any part of her treatment plan.

¶41 Section 41-3-609, MCA, the statute setting forth the criteria for termination of parental rights, provides in pertinent part:

(1) The court may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence . . . that any of the following circumstances exist:

. . .

(f) the child is an adjudicated youth in need of care and both of the following exist:

(i) *an appropriate treatment plan that has been approved by the court has not been complied with by the parents* or has not been successful; and

(ii) *the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.*

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:

. . .

(c) *excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child* . . . . [Emphasis added.]

¶42 Thus, before terminating an individual's parental rights, a district court must consider whether "an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful." *In re D.B.*, 2012 MT 231, ¶ 19, 366 Mont. 392, 288 P.3d 160 [hereinafter *D.B. II*] (quoting § 41-3-609(1)(f)(i), MCA). Hence, the court must first determine whether DPHHS has provided an "appropriate" treatment plan. *D.B. II*, ¶ 19. There is, however, no bright-line test for courts to determine whether a treatment plan is appropriate. Instead, courts should consider various factors, including whether the parent was represented by counsel, whether the parent stipulated to the plan, and whether the plan takes into consideration the particular problems facing both the parent and the child. *D.B. II*, ¶ 19. In addition,

since a natural parent's right to the care and custody of a child is a fundamental liberty interest, DPHHS bears the burden of proving, by clear and convincing evidence, that a treatment plan is appropriate. *In re A.N.*, 2000 MT 35, ¶ 24, 298 Mont. 237, 995 P.2d 427.

¶43 In this case, Mother was represented by counsel, she did stipulate to the treatment plan, and the plan did take into consideration Mother's particular problem—her drug addiction.

¶44 In addition, a district court must determine whether the parent's behavior will change within a reasonable amount of time. *D.B. II*, ¶ 25 (citing § 41-3-609(2), MCA). This determination requires that a district court "primarily consider the physical, mental, and emotional needs of the child. . . . That is, the court must be foremost concerned with the child's best interest when evaluating whether to terminate parental rights." *D.B. II*, ¶ 25 (citing § 41-3-609(3), MCA; *In re B.S.*, 2009 MT 98, ¶ 32, 350 Mont. 86, 206 P.3d 565).

¶45 Determining whether a parent's conduct is likely to change within a reasonable amount of time "requires a predictive assessment based upon past and present conduct of the parent" in question. *In re C.M.C.*, 2009 MT 153, ¶ 25, 350 Mont. 391, 208 P.3d 809. A parent's past behavior is considered in determining fitness to parent in the future. *In re A.J.E.*, 2006 MT 41, ¶ 27, 331 Mont. 198, 130 P.3d 612.

¶46 In its February 9, 2012 order denying Mother's motion to continue the termination hearing, the District Court pointed out that as of the date of the court's order, A.D.B. had not been in Mother's custody for eight months. The court also noted that a delay to allow

Mother to complete the Elkhorn treatment program would take another eleven months at least as Mother had not even been accepted into the program, and, even if she were accepted, the earliest she could start would be after her March 20, 2012 sentencing hearing. Elkhorn is a nine-month program and A.D.B. would not be allowed to be with Mother during Mother's attendance in the program.

¶47 John Donald, one of Mother's former chemical dependency counselors, testified that he had been recommending inpatient treatment for Mother since 2008, but she had been unwilling to participate in such treatment. Emily Zachariasen, A.D.B.'s court-appointed special advocate since April 2011, testified that even though she did not think Mother's parental rights should be terminated, she was not convinced that Mother would maintain sobriety even after nine months at Elkhorn. Zachariasen further testified that Mother had passed up more than one opportunity to participate in inpatient treatment programs where A.D.B could have been with Mother.

¶48 In addition, Jo Coyer, a child protection specialist with DPHHS, testified that she was not optimistic about the likelihood of Mother's successful treatment at Elkhorn. And, Jocelyn Nelson, a licensed clinical social worker who worked with Mother, testified that she did everything she could to offer support to Mother, but Mother never followed through with Nelson's offers of help and support. Nelson also testified that between June 2011 and January 7, 2012, Mother tested positive for drugs 12 times and missed 28 of her scheduled tests. Nelson further testified that because a missed test is considered a positive test, this meant that Mother tested positive for drugs 40 times during this 6-month time period. Mother only tested negative twice.

15

¶49 At the time of the termination hearing, Mother was not in treatment at Elkhorn. She was in jail awaiting sentencing on various drug charges, and there was no guarantee that Mother would be accepted at Elkhorn. Even assuming that Mother completed treatment at Elkhorn, she would still have to demonstrate the ability to maintain sobriety within the community for several months before it would be realistic to consider the possibility of Mother being able to resume parenting A.D.B.

¶50 Accordingly, we hold that the District Court did not err in concluding that Mother's drug addiction rendered her unfit to parent A.D.B., and that her condition was unlikely to change within a reasonable time.

**Issue 3.**

¶51 *Did the District Court have jurisdiction to terminate Father's parental rights?*

¶52 Father argues that the District Court's dispositional order granting DPHHS temporary legal custody of A.D.B. expired on November 4, 2011, and that the court never granted the State's petition to extend temporary legal custody. Father also argues that when the order for temporary legal custody expired, the court's adjudication that A.D.B. was a youth in need of care also expired. Consequently, Father contends that once the order for temporary legal custody expired, the court was without jurisdiction to entertain DPHHS's petition to terminate Father's parental rights.

¶53 The State contends that Father is confusing jurisdiction with statutorily created time limits. The State also points out that neither Father nor Mother objected to DPHHS's November 4, 2011 petition for extension of temporary legal custody since, at the time, both parents were incarcerated.

16

¶54 The Montana Constitution establishes the subject matter jurisdiction of the district courts. *Miller v. Eighteenth Judicial Dist. Court*, 2007 MT 149, ¶ 45, 337 Mont. 488, 162 P.3d 121 (citing Mont. Const. art. VII, § 4 (district courts have "original jurisdiction in all criminal cases amounting to felony and all civil matters and cases at law and in equity.")). Subject matter jurisdiction involves the court's fundamental authority to hear and adjudicate cases or proceedings. *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 57, 345 Mont. 12, 192 P.3d 186. "Subject matter jurisdiction 'can never be forfeited or waived, nor can it be conferred by the consent of a party.' " *Davis v. State*, 2008 MT 226, ¶ 20, 344 Mont. 300, 187 P.3d 654 (quoting *Miller*, ¶ 44). Furthermore, we explained in *BNSF Ry. Co. v. Cringle*, 2010 MT 290, ¶ 13, 359 Mont. 20, 247 P.3d 706, that the Legislature does not deprive the courts of subject matter jurisdiction when it enacts filing or notice deadlines.

¶55 Father argues that pursuant to § 41-3-442, MCA, if DPHHS does not request an extension of temporary legal custody, the District Court has no discretion but to dismiss the case as its dispositional order for temporary legal custody cannot be in effect for longer than six months under § 41-3-442(2), MCA. Section 41-3-442, MCA, provides in pertinent part:

> (4) Before the expiration of the order for temporary legal custody, the county attorney, the attorney general, or an attorney hired by the county shall petition for one of the following:
> (a) an extension of temporary legal custody, not to exceed 6 months, upon a showing that:
> (i) additional time is necessary for the parent or guardian to successfully complete a treatment plan; or
> (ii) continuation of temporary legal custody is necessary because of the child's individual circumstances . . . .

17

¶56    Contrary to Father's contentions, however, DPHHS did petition for an extension of temporary legal custody of A.D.B. within the six-month time limit specified in § 41-3-442(2), MCA. At the May 4 2011 dispositional hearing, both Mother and Father stipulated that temporary legal custody of A.D.B. should be transferred to DPHHS for six months. Thus, the court ordered that DPHHS's custody of A.D.B. should continue until November 4, 2011, "or upon further Order of the Court." On November 3, 2011, Mother overdosed on illegal drugs. The following day, November 4, 2011, DPHHS filed a petition to extend its temporary legal custody of A.D.B. for an additional six months. Thus, DPHHS filed its petition for extension within the six-month time limit. While Father contends that a district court must also act upon an extension petition within the six-month period that DPHHS has temporary legal custody of the child or lose jurisdiction of the case, no such provision appears in the statute.

¶57    Father also contends that because the District Court failed to grant a hearing on DPHHS's petition, said petition must be deemed denied and the case dismissed. On the contrary, subsection (5) of the statute provides: "The court may continue an order for temporary legal custody *pending a hearing* on a petition provided for in subsection (2)." Section 41-3-442(5), MCA (emphasis added). The District Court held a status hearing in this case on December 6, 2011, at which time DPHHS represented that it would be filing a petition to terminate both Mother's and Father's parental rights to A.D.B.

¶58    Father is also mistaken that A.D.B. was not an adjudicated youth in need of care at the time DPHHS filed for termination of Father's parental rights. To adjudicate a child a

18

youth in need of care, the State must prove, by a preponderance of the evidence, that the child has been abused, neglected or abandoned. *In re M.J.*, 2013 MT 60, ¶ 19, 369 Mont. 247, 296 P.3d 1197 (citing § 41-3-437(2), MCA; *In re I.B.*, 2011 MT 82, ¶ 20, 360 Mont. 132, 255 P.3d 56; *In re B.S.*, 2009 MT 98, ¶ 22, 350 Mont. 86, 206 P.3d 565).

¶59 Here, the District Court adjudicated A.D.B. a youth in need of care by stipulation of Mother on January 19, 2010, and by stipulation of Father on March 23, 2010. After Father was incarcerated and after Mother relapsed into drug use in November and December 2010, DPHHS filed its "Renewed Petition for Immediate Protective Services, Adjudication as a Youth in Need of Care and Temporary Legal Custody." The District Court granted DPHHS's petition in an order dated March 31, 2011, wherein the court stated that A.D.B. "has been, and continues to be, adjudicated a Youth in Need of Care as defined in § 41-3-102 MCA."

¶60 As the State pointed out in its brief on appeal, it would be absurd to conclude that the District Court's failure to issue a written order granting DPHHS's timely request for an extension of temporary legal custody resulted in the court losing jurisdiction of this case when neither parent was in a position to assume custody of A.D.B. since both parents were incarcerated, thus A.D.B. clearly remained a youth in need of care.

¶61 Accordingly, we hold that the District Court did have jurisdiction to terminate Father's parental rights.

**Issue 4.**

¶62 *Did Father's attorney render ineffective assistance of counsel?*

19

¶63     Father contends that his attorney rendered ineffective assistance of counsel when she failed to move to dismiss the case once temporary legal custody of A.D.B. expired, or to object to the termination petition when the State failed to demonstrate that A.D.B. was an adjudicated youth in need of care for purposes of termination under § 41-3-609(1)(f), MCA.  Contrary to Father's contentions, the State points out that a motion to dismiss this case by Father's counsel would have been pointless since DPHHS would have simply re-filed a petition for temporary legal custody based on the overwhelming evidence that A.D.B. was a youth in need of care.  Citing § 41-3-609(4)(c), MCA, which provides that "[a] treatment plan is not required under this part upon a finding by the court following hearing if . . . the parent is or will be incarcerated for more than 1 year and reunification of the child with the parent is not in the best interests of the child," the State maintains that DPHHS then could have requested that the court excuse it from the requirement of developing a treatment plan for Father based upon his 40-year prison term, and proceeded directly to a petition to terminate Father's parental rights.

¶64     The Due Process of Clause of the Montana Constitution (Article II, Section 17) provides a parent in a termination of parental rights proceeding with the right to the effective assistance of counsel.  *D.B. II*, ¶ 30 (citing *In re A.S.*, 2004 MT 62, ¶¶ 12, 20, 320 Mont. 268, 87 P.3d 408).  However, a parent may not sustain an ineffective assistance of counsel claim when the parent cannot demonstrate prejudice as a result of the ineffective assistance.  *D.B. II*, ¶ 30 (citing *In re C.M.C.*, 2009 MT 153, ¶ 30, 350 Mont. 391, 208 P.3d 809).

¶65 As we indicated in the previous issue, contrary to Father's contentions, DPHHS's temporary legal custody of A.D.B. did not "expire." A timely-filed petition for extension of temporary legal custody was pending before the District Court. In addition, A.D.B. continued to be a youth in need of care pursuant to the court's March 31, 2011 order.

¶66 Because we conclude that any objection by counsel to the alleged problems as perceived by Father would have been without merit, Father's ineffective assistance of counsel claim must fail.

¶67 Accordingly, we hold that Father's attorney did render effective assistance.

## Issue 5.

¶68 *Did the District Court err in terminating Father's parental rights based upon his incarceration for mitigated deliberate homicide?*

¶69 Father contends that the District Court erred in terminating his parental rights when there was overwhelming evidence that a guardianship or other long-term custody arrangement would have preserved Father's inherent obligation to support A.D.B.

¶70 Section 41-3-609, MCA, the statute setting forth the criteria for termination of parental rights, provides in pertinent part:

> (2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, *unable*, or unwilling *to give the child adequate parental care*. In making the determinations, the court shall consider but is not limited to the following:
>
> .  .  .
>
> (b) a *history of violent behavior* by the parent;
>
> .  .  .
>
> (d) present *judicially ordered long-term confinement* of the parent. [Emphasis added.]

21

¶71    In this case, Father is unable to give A.D.B. adequate parental care both because of his history of violent behavior (i.e., his conviction for mitigated deliberate homicide) and his judicially ordered long-term confinement (i.e., his sentence of 40 years in prison without the possibility of parole). A.D.B. was only eight months old when Father was incarcerated. A.D.B. will be 40 years old by the time Father is released from prison.

¶72    Father points out that during the 11 months that he was detained at the Missoula County Detention Facility, he had weekly visits with A.D.B. and that he communicated with her as much as possible. However, he also pointed out that since his transfer to the detention facility in Great Falls, even though he continues to communicate with A.D.B. via telephone and the mail, he has only seen A.D.B. once.

¶73    Furthermore, under Father's "financial obligation to support" theory, a district court would never have the authority to terminate parental rights no matter the circumstances of abuse and neglect. Even if there were some merit to Father's theory, Father's ability to financially support A.D.B. was significantly compromised by Father's 40-year prison sentence. Father pointed out that he is only able to send $15 to $20 per month to help support A.D.B. While it is commendable that Father tries to send money from his meager earnings in prison, it is hardly a sufficient amount to cover the expenses of an active child. Nevertheless, there is nothing to prevent Father from continuing to send money for A.D.B.'s care and support even though Father's parental rights have been terminated.

¶74 Accordingly, we hold that the District Court did not err in terminating Father's parental rights based upon his incarceration for mitigated deliberate homicide.

**Issue 6.**

¶75 *Did the District Court correctly conclude that termination of Mother's and Father's parental rights was in A.D.B.'s best interest?*

¶76 Counsel for A.D.B. contends that DPHHS and the District Court provided no compelling state interest for severing the relationship between Mother and A.D.B. Counsel maintains that waiting for Mother to complete the inpatient treatment program at Elkhorn is reasonable and in A.D.B.'s best interests given the quality and attachment of A.D.B.'s particular relationship with Mother. Similarly, Father opposes the termination of both Mother's and Father's parental rights. Instead, Father would prefer to see a guardianship granted to A.D.B.'s maternal grandparents with the goal to reunite A.D.B. with Mother.

¶77 The State maintains that while Mother has been shown to be a good mother when she is sober, Mother has not been sober for the vast majority of A.D.B.'s life. The State argues that the District Court correctly concluded that it was not in A.D.B.'s best interest to wait any longer for a safe, stable home that would not be disrupted by Mother's drug-induced behavior.

¶78 A.D.B. is now four years old. She has been the subject of a youth-in-need-of-care proceeding for almost three and a half of those four years. During the nine months that Mother would attend treatment at Elkhorn, Mother would have no contact with A.D.B. And, even assuming that Mother completed treatment at Elkhorn, she would still have to

23

demonstrate the ability to maintain sobriety within the community for several months before it would be realistic to consider the possibility of Mother parenting A.D.B. Thus, assuming Mother never again relapsed into her drug-addictive behavior, it would be at least a year from the time Mother enters Elkhorn until it could be shown that she has successfully overcome her addictions.

¶79 Jo Coyer, a child protection specialist with DPHHS, testified that it would be detrimental to A.D.B.'s well-being to disrupt the strong bond that has been developing between A.D.B. and her maternal grandparents for the remote possibility that Mother might be able to maintain sobriety when there is virtually no past evidence of her ability to do so.

¶80 As we have previously stated, "[c]hildren need not be left to 'twist in the wind' before neglect may be found chronic and severe." *In re M.N.*, 2011 MT 245, ¶ 29, 362 Mont. 186, 261 P.3d 1047. Father is in prison for 40 years and Mother is a drug addict with a long road of intensive treatment ahead of her and no guarantees of success.

¶81 Accordingly, we hold that the District Court correctly concluded that termination of Mother's and Father's parental rights was in A.D.B.'s best interests.

¶82 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ BETH BAKER
/S/ JIM RICE
/S/ BRIAN MORRIS

24

Chief Justice Mike McGrath specially concurs.

¶83 While I concur with the decision to affirm the termination of both parents' parental rights, I maintain that the District Court abused its discretion by appointing an attorney for the child in this case.

¶84 Montana law provides for the appointment of a guardian ad litem (G.A.L.) in cases seeking termination of parental rights. By law, the G.A.L.'s role is to review the family situation and facts surrounding the case and advise the court as to the best interest of the child. *See* § 41-3-112(3), MCA. As a general rule, appointment of an attorney for a child is not required unless a G.A.L. is not appointed. Section 41-3-425, MCA. A G.A.L. is not required to be an attorney. In certain cases, the code provides the court with the discretion, "when appropriate" to appoint an attorney for the child even though a G.A.L. has been appointed.[1] Section 41-3-425(3)(b), MCA. Such an appointment serves a logical purpose in situations where older children are involved – children above the age of reason who may be able to develop and express an opinion that would help the district court determine the best interest of that child. *See e.g. In re J.J.S.*, 176 Mont. 202, 205-06, 577 P.2d 378, 381 (1978); *In re M.D.Y.R.*, 177 Mont. 521, 535, 582 P.2d 758, 766 (1978). The appointment of an attorney for an infant or child below the age of reason, however, is frankly absurd and serves no useful purpose other than to complicate the litigation.

---

[1] Section 41-3-112, MCA, requires the appointment of a G.A.L. in every proceeding for any child alleged to be abused or neglected. The statute further prescribes training and duties for persons appointed as a G.A.L., including a requirement for specific training related to serving as a child's court-appointed representative.

¶85    In our society, parents are responsible for making decisions for children who are unable to decide for themselves. Consequently, parents have the right and responsibility to decide where a child lives, what a child eats, how a child is disciplined, whether and where a child goes to church, and where that child attends school. *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054 (2000). However, in cases such as this, when the parents have abdicated their responsibility to care for that child, then the State has the responsibility to provide protective services as required in Title 41. *See* §§ 41-3-422(6)-(9) and (11), MCA; § 41-3-425, MCA.

¶86    In those circumstances, the court has the responsibility to determine whether the children are youths in need of care, § 41-3-437, MCA, and ultimately decide an appropriate disposition for that child, § 41-3-438, MCA. As parties, the parents, whose parental rights are being contested by the State, are entitled to be represented by counsel in these proceedings. Section 41-3-425, MCA; *In re J.J.L.*, 2010 MT 4, ¶ 16, 355 Mont. 23, 223 P.3d 921.

¶87    However, nothing in the Montana Constitution, statutes, or case law provides a right to counsel for the child. The child is the subject of litigation but does not have the ability to provide direction for the attorney as to how to proceed. How does the attorney determine her client's legal position? Should it be based on the personal view of the lawyer? That is not our proper role as attorneys.

¶88    The Montana Rules of Professional Conduct are instructive. Subsection (3) of the preamble, which defines a lawyer's responsibilities, provides:

(3) As a representative of clients, a lawyer performs various functions. In performance of any functions a lawyer shall behave consistently with the requirements of honest dealings with others. As advisor, a lawyer endeavors to provide a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. As advocate, a lawyer asserts the client's position under the rules of the adversary system. As negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements under these Rules of honest dealings with others. As an evaluator, a lawyer acts by examining a client's legal affairs and reporting about them.

The Client-lawyer relationship is addressed in Rule 1.2, Scope of Representation and Allocation of Authority between Client and Lawyer:

(a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. . . .

Finally, attorney-client communication is addressed in Rule 1.4 – Communication:

(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(g), is required by these Rules;
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

¶89 None of the traditional attorney-client functions and responsibilities can be followed where the client is an infant or below the age of reason. While the G.A.L. has a role as an advocate for the child, the role of the attorney appointed to the child is unclear.

27

A G.A.L. is trained for that role and conducts an independent investigation to evaluate the facts and advise the court. That is not the role of the attorney.

¶90 The court has ably demonstrated the substantial evidence that supports the District Court's decision in this case. Yet, the child's counsel takes the position that termination was not in the child's best interest; that the State should have made a better effort to reunite the child and mother and disputed the District Court's conclusion that the mother's condition was unlikely to change within a reasonable time. How did an attorney representing a three-year-old child reach this conclusion? Why is that position in the best interest of the child? What are the standards that should be applied by an attorney in taking a position without the guidance of a client? Who then decides what position to take or, for that matter, whether to appeal, and on what grounds?

¶91 Further, the majority opinion has summarized the pertinent timelines involved in this proceeding. After years of State and court involvement, the termination order was issued in March 2012. At that time the client was three years old. The parents appealed. The mother's brief was filed on August 8, 2012; the father's brief was filed on October 11, 2012. The attorney who had been appointed to represent the three-year-old child, after deciding sua sponte to appeal, filed a brief on December 6, 2012, further delaying a permanent placement for her client.

¶92 An attorney, acting alone, certainly has no authority to file and participate in an appeal to this Court. Attorneys appointed for a child below the age of reason do not have a client capable of making a knowing and intelligent decision. An attorney at law has no legal basis to make that decision for them.

28

¶93    There are situations where an attorney's presence is not helpful or appropriate and merely serves to unnecessarily complicate or delay the proceedings.  This is one of those situations.  In my view the court abused its discretion by making this appointment.

¶94    To the extent that this Court's recent opinion in *In re K.H.,* 2012 MT 175, 366 Mont. 18, 285 P.3d 474, provides otherwise, I would overrule it.

/S/ MIKE McGRATH