DA 25-0243

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 301N

IN THE MATTER OF:

R.T.C. and R.J.C.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Toole, Cause Nos. DN-23-09 and DN-24-07
Honorable Gregory L. Bonilla, Presiding Judge

COUNSEL OF RECORD:

      For Appellant Father:

          Robin Meguire, Attorney at Law, Great Falls, Montana

      For Appellant Mother:

          Daniel Eakin, 406 Law, Sidney, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant Attorney General, Helena, Montana

          Merle Raph, Toole County Attorney, Shelby, Montana

Submitted on Briefs:  October 15, 2025

Decided:  December 29, 2025

Filed:

_____
                        Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Mother and Father both appeal from the orders issued by the Ninth Judicial District Court, Toole County, terminating their rights to R.T.C. and R.J.C. under § 41-3-609(1)(f), MCA. Both Mother and Father assert there was no probable cause at the show cause stage to determine the children to be in immediate or apparent danger such that removal was necessary. Father additionally asserts his treatment plan was not appropriate, his counsel was ineffective when counsel did not participate on his behalf at R.T.C.'s termination hearing, he was denied due process when he was permitted to represent himself, and the District Court should have considered guardianship as an alternative to termination.

¶3 Mother presented to Benefis Hospital on March 16, 2023, to deliver R.T.C. Prior to this date, an earlier report to the Department of Public Health and Human Services, Child and Family Services Division (the Department), indicated Mother had, on January 11, 2023, tested positive for amphetamines, marijuana, benzodiazepines, and oxycodone. Because of this prior positive test, hospital policy required collection of a urine sample from Mother. Father advised Mother not to give consent to a urine sample. Mother, however, desired an epidural. In response, nursing staff advised her such would require

2

lab work. Reportedly, Father then became aggressive requiring security to remove him from the hospital. Upon insertion of a catheter for the epidural, a urine sample was collected from Mother which again tested positive for amphetamines, marijuana, benzodiazepines, and unprescribed pills. Upon birth, R.T.C. exhibited respiratory issues requiring treatment in the NICU. Usual testing attendant to R.T.C.'s birth and treatment of the respiratory issues indicated drug exposure to meconium in the womb resulting in withdrawal symptoms.

¶4 R.T.C. was removed shortly after birth based on the presence of illicit drugs in his system. At the show cause hearing on May 4, 2023, while neither parent offered any evidence to rebut the Department's allegations, they asserted R.T.C. was not in immediate danger of abuse or neglect and thus no probable cause existed for his removal or emergency protective services. This argument was rejected by the District Court.

¶5 On July 27, 2023, although he did not dispute any facts, Father contested adjudication, again asserting his prior legal argument that R.T.C. was not in immediate danger of abuse or neglect such that no probable cause existed for his removal or for emergency protective services. Mother did not admit any particular allegations but did not contest adjudication. The District Court adjudicated R.T.C. as a youth in need of care (YINC).

¶6 The Department prepared treatment plans for both Mother and Father. At a hearing where both parents were represented by counsel, Mother did not object to her proposed treatment plan and Father only objected to the provision prohibiting him from alcohol

consumption. Before approving the treatment plans, the District Court specifically asked the parents if there were any further objections to either treatment plan. The parties affirmatively responded there were not. The District Court then approved Mother's plan without modification and approved Father's plan, but struck the prohibition on alcohol consumption.

¶7 On May 31, 2024, the Department filed its petition seeking termination of both parents' parental rights to R.T.C. based on their failure to complete their treatment plans. Later, at a hearing on July 11, 2024, despite his prior stipulation to the tasks ordered in his treatment plan, Father objected to his treatment plan asserting drug testing was not appropriate because nothing suggested he had a drug problem. The Department argued that R.T.C. was born with drugs in his system and that Mother and Father were residing in the same home and, to potentially return R.T.C., drug testing was important in assuring R.T.C.'s safety. The District Court determined Father's drug testing requirement to have been appropriate when the plan was originally approved and remained appropriate.

¶8 On August 1, 2024, Mother presented to the Cut Bank Hospital to deliver R.J.C. A drug screen indicated mother was again positive for illicit drugs, including amphetamines, methamphetamines, benzodiazepines, and marijuana. Mother was transferred to Benefis Hospital where R.J.C. was born. At Benefis, Mother refused any urine or blood testing of herself. Like R.T.C., R.J.C. exhibited respiratory problems requiring placement in the NICU. R.J.C. developed what was believed to be withdrawal symptoms and the hospital sought testing which Father refused. R.J.C. was removed from the parents' care and the

4

Department consented to the hospital's requested tests. Testing of R.J.C.'s urine and blood was positive for amphetamine, methamphetamine, benzodiazepine, and THC. At the EPS hearing on August 8, 2024, both parents challenged the Department's reliance on R.J.C.'s drug test results. The District Court found probable cause even without the drug test evidence based on the parents' general denial for medical care and testing of R.J.C. when he was exhibiting respiratory issues and testing was requested by medical professionals to determine how best to address his respiratory issues—thus placing R.J.C. in danger.

¶9 On December 31, 2024, Mother filed a motion to dismiss, arguing that she had refused drug testing which had been conducted at both hospitals despite her refusal of consent for such. She asserted her positive drug tests should not be able to be used against her and sought their exclusion. The District Court held her motion in abeyance but did find the Department had met its show cause burden.

¶10 Father sought a representation hearing which was held on January 9, 2025. At that hearing Father discussed his complaints about his attorney with the District Court and ultimately agreed to continue with his appointed counsel, Harris, representing him. With regard to R.T.C., the court held a termination hearing on January 15, 2025. Neither parent appeared for the hearing. Mother's counsel advised that counsel lacked evidence to counter the Department's termination petition. Father's counsel advised that since Father was not present, he could not ethically forward any argument. The District Court then entered an oral order terminating both parents' parental rights to R.T.C. and issued its written order on March 5, 2025.

5

¶11   The Department then sought adjudication of R.J.C. as a YINC, a determination that reunification efforts were not required as to R.J.C., and termination of both parents' parental rights to R.J.C.  The Department based its request on the termination of both parents' parental rights to R.T.C. which had occurred the week before.

¶12   On April 9, 2025, in response to Father seeking a second representation hearing, another hearing was held to discuss Father's complaints regarding his counsel.  Again, the District Court engaged in a lengthy discussion with Father about his complaints regarding his counsel, following which Father was permitted to represent himself as he requested.  The court also granted Father a continuance of the termination hearing.  On May 2, 2025, in regard to R.J.C., a hearing was held on the Department's request for adjudication, request to not be required to provide reunification services, and its request for termination of both parents' parental rights.  At the conclusion of the hearing, the District Court orally adjudicated R.J.C. as a YINC and granted the Department's petition in its entirety.  The District Court issued its subsequent written order on May 5, 2025.

¶13   We review a termination of parental rights for an abuse of discretion and underlying findings for clear error.  *In re A.B.*, 2020 MT 64, ¶ 23, 399 Mont. 219, 460 P.3d 405; *In re D.F.*, 2007 MT 147, ¶ 21, 337 Mont. 461, 161 P.3d 825.  We view the evidence in the light most favorable to the prevailing party.  *In re A.M.G.*, 2022 MT 175, ¶ 18, 410 Mont. 25, 517 P.3d 149.  Termination under § 41-3-609(1)(f), MCA, is controlled by settled law.

¶14    Ineffective assistance of counsel (IAC) claims are mixed questions of fact and law that are reviewed de novo. *State v. Ward*, 2020 MT 36, ¶ 15, 399 Mont. 16, 457 P.3d 955. "The Due Process of Clause of the Montana Constitution (Article II, Section 17) provides a parent in a termination of parental rights proceeding with the right to the effective assistance of counsel." *In re A.D.B.*, 2013 MT 167, ¶ 64, 370 Mont. 422, 305 P.3d 739. Claims of ineffective assistance of counsel in dependent neglect proceedings cannot succeed if the parent is unable to demonstrate prejudice as a result of the ineffective assistance. *In re A.D.B.*, ¶ 64.

¶15    From our review of the record, we find no error by the District Court in terminating both parents' parental rights to R.T.C. and R.J.C.  Although Mother combines facts surrounding her drug testing at both Benefis and the Cut Bank hospitals together, neither parent raised the request to exclude her test results until R.J.C.'s EPS hearing, by which time R.T.C. had been adjudicated a YINC and both parents' treatment plans had been approved and ordered as discussed above.  Even were we to accept Mother's argument to exclude Mother's drug tests taken at the time of the children's births, the evidence remains that Mother had a positive drug test during her pregnancy with R.T.C.  Further, both R.T.C. and R.J.C. exhibited symptoms of drug withdrawal at their respective births requiring NICU care.  This, along with Father's denial of consent to testing so medical professionals could learn the basis of R.T.C.'s respiratory issues and how to treat them, was sufficient evidence for the District Court to conclude there was probable cause to believe R.T.C. was abused or neglected and in need of emergency protection.  By the time R.J.C. was born, as

7

part of their ordered treatment plans both parents had undergone substance use evaluation with Father admitting to drug use and both Mother and Father failing to follow through with drug testing or substance use treatment recommendations. Given the parents' refusal to provide consent to learn the basis of R.J.C.'s respiratory issues and how to treat them, the history of R.T.C. experiencing similar respiratory issues related to drug withdrawal, and Mother and Father's failure to participate with drug testing or substance use treatment, there was sufficient evidence for the District Court to conclude there was probable cause to believe R.J.C. was abused or neglected and in need of emergency protection.

¶16 Neither parent seriously disputes that they failed to complete their court-ordered treatment plans, but if they did, the record is replete with evidence that each parent failed to complete nearly every treatment plan task required of them. They were inconsistent in visits, refused drug testing, failed to implement skills learned in parenting classes, failed to obtain mental health evaluations, and failed to stay in consistent contact with the Department. Although Father did file a motion regarding visitation, the District Court noted Father did not abide by terms and conditions set by the contracting entity providing supervision of visits such that any lack of visitation was occasioned by Father's conduct.

¶17 Although the parents stipulated to the treatment plans as ordered, both now assert their treatment plans were not appropriate. Mother asserts her plan was inappropriate as it failed to account for domestic violence concerns. We are not persuaded by this assertion. Domestic violence issues did not arise for more than a year after the treatment plans were ordered, throughout which time Mother had failed to complete treatment plan tasks and

8

had failed to demonstrate any meaningful improvement in her ability to parent. From this it would be reasonable for the District Court to believe that adding additional domestic violence tasks would be futile.

¶18 Father asserts his stipulation to his ordered treatment plan was based on complaints about his original counsel. We find this argument unavailing. The record amply demonstrates Father appeared at the treatment plan hearing, actively participated, and through efforts of his counsel, the District Court modified Father's treatment plan sustaining his objection to a preclusion on alcohol consumption and ordering that task be stricken. Father was given full opportunity to raise any other objections and failed to do so. The District Court even went so far as to consider the treatment plan anew at a subsequent hearing requested by Father at which he was represented by different counsel. From review of the record, it is evident that drug use in the parents' home created substantial risk to R.T.C. and R.J.C. and their treatment plans were appropriately designed to address this issue.

¶19 Next, Father asserts his third counsel was ineffective for failing to object to his treatment plan and in not advocating against termination when Father failed to appear at the termination hearing respecting R.T.C. The record does not evidence Father's counsel to be ineffective. Throughout these combined proceedings, Father was represented by three different counsel. Father's original counsel secured modification of his treatment plan as requested by Father. Father's second counsel raised objection to his treatment plan and the District Court considered it anew, concluding the plan appropriate when originally

ordered and upon new review. Given this, Father's third counsel had no basis to again raise objection to the appropriateness of his treatment plan.

¶20 Father also faults his third counsel for Father's absence from R.T.C.'s termination hearing. The District Court considered this argument but found Father had notice of the hearing and any failure to be present was occasioned by him, not his counsel. When Father failed to appear at the termination hearing, his counsel understandably was unsure as to how to proceed in Father's absence. Father has not demonstrated any evidence or opposition to the evidence presented by the Department that counsel could reasonably have made without him there.[1]

¶21 Father next asserts that despite him requesting to be able to represent himself pro se in regard to the termination hearing involving R.T.C., the District Court erred in letting him do so. In essence, he asserts his waiver of counsel was not knowingly, voluntarily, and intelligently made. This assertion ignores the fact that the District Court held two representation hearings in which it discussed Father's complaints regarding counsel.

---

[1] At the second representation hearing, Father advanced the idea that his counsel was ineffective for failing to present his theory of medical negligence that the presence of illicit drugs in his children's systems at birth was the result of the hospital delivery staff not making sure his children did not ingest any meconium. The District Court thoroughly discussed that in order to do so Father would have needed to have an expert testify as to the standard of care and a breach of the standard of care and Father acknowledged he had no such expert. Regardless, the reality of the situation is that, even if hospital staff could have prevented such, it ignores the primary concern that the children were exposed to illicit drugs by Mother while in the womb and the parents actively tried to conceal this when the hospital requested testing to help medical professionals determine the basis for the children's symptoms and how to treat such—indicating the parents were more willing to protect themselves from discovery than they were to care for their newborns' medical needs. Father's assertion of counsel's ineffectiveness in this regard is not supported as whether a hospital could have protected the children from ingesting meconium does not alleviate the concern of drug use in the parents' home or eliminate the existence of probable cause as discussed above.

Although Father asserts the District Court failed to sufficiently advise him of the danger, risks, and disadvantages of self-representation and make sufficient inquiry in the face of his request to represent himself, upon review of those hearings such is not an accurate perception. At the April 10, 2025 hearing, Father's counsel explains in Father's presence that Father is ill-equipped to represent himself, that he does not understand the law or requirements for presentation of evidence nor what is relevant to the issues in the case. He explains that Father is stubborn and does not want to follow his advice. He also explains that despite this, Father has a constitutional right to represent himself should he desire to do so. The District Court reiterates to Father that it is ill-advised to represent himself and to do so is a "fool's errand." Despite hearing the dangers and pitfalls of self-representation and in particular his self-representation, Father adamantly represented he desired to represent himself. On the record before us, although we may have made a different decision and generally caution against permitting parents to engage in self-representation, it was not error for the District Court to permit Father to represent himself.

¶22 Finally, Father asserts the District Court erred in failing to consider a guardianship in lieu of termination. As the issue is framed on appeal, the District Court did not abuse its discretion in not considering a guardianship. Father failed to raise this issue below. We have consistently held that we will not consider issues raised for the first time on appeal. *In re T.E.*, 2002 MT 195, ¶ 20, 311 Mont. 148, 54 P.3d 38 (collecting cases). Similar to here, in *In re D.H.*, 2001 MT 200, 306 Mont. 278, 33 P.3d 616, the appellant parents argued for the first time on appeal that the trial court abused its discretion by not ordering a less

11

restrictive alternative to termination. As this argument was not presented to the district court, we declined, as we do here, to address the matter on appeal. *In re D.H.*, ¶ 41.

¶23 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶24 Affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M BIDEGARAY
/S/ BETH BAKER
/S/ JIM RICE